OPINION OF THE COURT
Michele Pirro Bailey, J.
Petitioners, Ricardo and Laura Suarez (hereinafter grandparents), filed a petition on June 20, 2012 against their son, Ernesto Suarez (hereinafter father), and Melissa Williams (hereinafter mother) seeking custody of their grandchild (DOB: xx/xx/2002). The respondents were served with the petition, appeared with counsel and entered denials. The child was assigned an Attorney for the Child to represent his position and interests.
The court has taken judicial notice of all prior proceedings involving this family and notes that prior to the filing of the grandparents’ petition, the father had filed two separate petitions in Onondaga County under docket No. V-7833-11 seeking to modify an order of custody/visitation dated May 9, 2006. Father’s first petition to modify visitation was filed on November 16, 2011. Mother was served and initially appeared pro se, expressing concern that father was driving the child around while he had a suspended license and that there was a MRSA outbreak in the father’s home. Thereafter, mother *992 retained Scott Micho, Esq. and, on April 18, 2012, father filed an amended petition for modification of custody, alleging in part that the child did not live with the mother, but lives with the paternal grandparents. The father further alleged that the child has attended school in the district where the paternal grandparents live since kindergarten, and that they take him to all doctor’s appointments, oversee his schooling and attend all school meetings and functions. Father alleged that mother had no substantive involvement with the child though she exercised visitation and collected child support from him. During the April 20, 2012 court appearance on that petition, father’s attorney expressed concern that mother would remove the child from his school district and transfer him to the Liverpool School District where she lives. Mother, with counsel present, agreed to leave the child in his school until the end of the school year. The matter was scheduled for trial on July 9, 2012; however, on that date, petitioner withdrew his petition in light of the filing of the grandparents’ petition.
Thereafter, on July 13, 2012, father filed a second petition for modification which was ultimately withdrawn on August 28, 2012.
Father’s modification petitions sought to modify an order of custody/visitation dated May 9, 2006 and entered by the Oneida County Family Court. The order was entered by stipulation in response to the filing of an original custody/visitation petition (docket No. V-1161-06) by the father, who had been living in Massachusetts for an extended period of time. During the proceedings held on that petition on April 27, 2006, mother represented to the court that the paternal grandparents had helped extensively with the child as they reside in the area and that she intended to move to Barneveld in the summer. Father indicated that he stayed in Barneveld at his parents’ home when he visited the area. Mother and father stipulated to an order of joint legal custody with primary physical residence with mother. The order further provided for reasonable visitation as the parties could agree, with leave to father to petition for visitation in Massachusetts when the child turned six years old.
On the date of the custody/visitation stipulation (Apr. 27, 2006), mother filed a petition seeking child support from the father (docket No. F-2156-06). On May 17, 2006, mother represented to the court that she worked at two jobs—one full-time at MetLife and one part-time at American Building Mainte *993 nance, and that she carried the child on her medical insurance policy.
On June 16, 2006, mother advised the Oneida County Family Court that she had left employment at American Building Maintenance because her mother had a stroke. On July 28, 2006, mother represented to the court that grandmother paid for the child’s daycare because she could not afford it. Mother acknowledged that father visited once or twice a month and the child stayed at the grandparents’ house during such visits.
Five years later, on September 29, 2011, father filed a petition in Oneida County seeking modification of the order of visitation. On October 6, 2011, that petition was dismissed without prejudice, on the court’s motion, insofar as the mother and child resided in Onondaga County.
The instant petition, filed by the grandparents, alleged that at the time that the 2006 order of custody/visitation was issued between father and mother, the child resided with the grandparents and at no time since has the child resided with either the father or the mother. Grandparents allege that the child resided with them from when he was eight days old until May 1, 2012, when mother took the child after a court appearance and refused to allow him to continue to reside with the grandparents.
Grandparents further allege that they have attended to the child’s every need from healthcare to education to financial care, and that mother has provided no financial assistance although she was receiving child support from the father. Grandparents contend that mother and father have left all responsibility for the parenting of the child to them. Grandparents allege that it is in the best interests of the child for custody to be awarded to them.
The trial in this matter was held on November 26, 27, 28, 29 and 30th and December 3, 4, 5, 6 and 7th. Prior to the commencement of the trial on November 26, 2012 Attorney Kurtz was substituted as counsel for mother. In addition, father advised the court that he consented to the relief requested by his parents, the grandparents. The court heard from the following witnesses: mother, grandfather, Beverlee L. (first grade teacher at Roberts School), Teresa C. (retired second grade teacher at Roberts School), Christine F. (grandparents’ next door neighbor), Megan P. (teacher aid at UCP daycare), Sherri F. (vice principal at Porter Elementary), Janet K. (principal of Roberts School), grandmother, Kara K. (second *994 grade teacher at Roberts School), Diane R (school nurse at Roberts School), Ava D. (teacher’s assistant at Roberts School), father, Preston C. (friend of mother), mother’s two daughters S. and J., Christine W. (mother’s aunt), Michael C. (mother’s friend), Constance C. (office manager for Jim C.’s employer), Jim C. (mother’s boyfriend/fiancé) and Heather M. (mother’s sister). A number of exhibits were also received and the court conducted a Lincoln hearing with the subject child. Following the trial, counsel submitted memoranda of law, the last being received by the court on January 7, 2013.
The court has had the unique opportunity to observe the parties and witnesses and to assess their demeanor and credibility. Based upon the record as a whole, in consideration of the required quantum of proof, and after careful and due deliberation, the court makes the following determination.
The evidence in the record established that the child began living with the grandparents in August 2002 within 10 days of his birth. Mother and father had taken the infant to the New York State Fair and, upon learning of the parents’ plan to take the child to an evening concert, the grandparents (who were at the fair) offered to and did take the child home with them. Thereafter, the child never went to live with the father and did not spend any significant periods of time in father’s physical custody. For her part, mother never retrieved the child to live permanently with her, although she did exercise parenting time regularly including overnights and extended periods of time. Mother never exercised her right to physical custody of the child as granted by the 2006 order of custody/visitation until May 1, 2012 when, after a court appearance concerning father’s modification petition, mother removed the child from the grandparents’ home and did not return him.
In the fall of 2003, grandmother enrolled the child in daycare at UCP in Utica. The grandparents were solely responsible for paying the costs of daycare and, except for intermittent occasions, they routinely transported the child. Grandparents regularly attended daycare events and activities for the child.
Megan P. was a teacher aid at the UCP daycare in Utica. She testified that the grandparents primarily transported the child to and from daycare while he was in her classroom from 18 months until three years old. To the best of her knowledge, he was living with the grandparents and she would provide private babysitting services for him at their home. The witness acknowledged that the child had a bed at the grandparents’ *995 home. Ms. P. met mother at the child’s birthday parties and major life events for a total of 5 to 10 times during the period the child was in her classroom. None of these events occurred at the mother’s home. Ms. P. never took the child to mother’s house to babysit him and it was her understanding that the child visited for a night or weekend with mother.
Aside from paying the daycare expenses, it is important to note that mother admitted that the grandparents claimed the child as a dependent on their taxes—all while mother was working full-time.
Mother admitted that grandfather took the child to his doctor and dentist appointments. In addition, at some time in 2002, mother and father voluntarily signed a statement as follows: “This is to certify that Laura and/or Ricardo Suarez (Grandparents) have any and all decision making power regarding our son . . . ; DOB xx/xx/02. This is in effect at all times and has no expiration date.” (See petitioner’s exhibit 1.) This authorization was never revoked by either parent.
Thereafter, on June 13, 2006 (after the issuance of the custody/visitation order between father and mother and during the pendency of the support proceedings between them), mother voluntarily signed a second document which provided in part “Please be advised that Laura M. Vieira-Suarez and Ricardo [Suarez] have my permission to act as guardian to my Son . . . (DOB xx/xx/02) regarding any and all decisions that pertain to him in the areas of education and/or any medical emergencies that may arise.” (See petitioner’s exhibit 2.) This authorization was similarly never revoked by mother.
Finally, on a later unspecified date, mother signed a document providing “I Melissa Williams, Mother and custodial guardian of. . . [,] D.O.B. xx/xx/02[,] give Laura and/or Ricardo Suarez permission to make any and all medical and Educational decisions as needed regarding and in the best interest of . . . . This granted permission is open and ongoing.” (See petitioner’s exhibit 3.) The authorization was never revoked. When presented with exhibits 1, 2 and 3, mother admitted signing them and that one of them was specifically intended to allow grandparents to enroll the child in Roberts School in Syracuse, New York.
In 2002, grandparents lived in Barneveld and mother lived in Utica. Mother lived there until July of 2006 when she moved to Barneveld, and remained there until November 2008 when she moved to Liverpool. Then, in mid-September 2012, mother *996 moved in with her current boyfriend/fiancé, Jim C., in Cicero, New York. When mother moved to Barneveld, grandmother bought the trailer for mother and her two daughters to live in. During that time period, mother and grandparents were in close proximity to each other.
In 2006, mother’s mother had a stroke and mother spent a significant amount of time attending to her medical needs. Thereafter, her father got sick and she attended to his medical needs until he passed away in 2009.
The unrebutted evidence demonstrated that grandparents lived in Barneveld, NY when the child was born in 2002, and moved to Syracuse, NY in 2006. The evidence was equally unequivocal that father lived in Utica, NY from 2002-2004 and has lived in Massachusetts since. Finally, the evidence established that mother lived in Utica, NY from 2002-2004, at which time the grandparents purchased a trailer for her and put it in a trailer park across the street from them in Barneveld, NY. Mother and her daughters lived there until 2008, when grandparents paid to move the trailer for mother and her girls to Casual Estates in Liverpool, NY so mother could be physically closer to the subject child. In September 2012, mother moved her daughters and the child in with her boyfriend/fiancé, Jim C., in Cicero, NY.
The parties disagreed significantly concerning where the child was living from birth until May 1, 2012. Father confirmed the grandparents’ account that they had taken the child home from the New York State Fair when he was four days old, and that the child did not return to reside with his parents at least as of the time the father left for Massachusetts in 2004. During that time, the parents lived approximately 12 miles away from the grandparents.
According to the grandparents, during the first two months of the child’s life, mother saw him two times per week. The grandparents encouraged father, mother and her daughters to come to their house often for dinner.
The grandparents testified that from six months to two years old, the parents saw the child sporadically on Tuesdays, sometimes Wednesdays, once to twice a month on a weekend, and on holidays including Christmas. They never took the child overnight though they were provided opportunities to do so. There was never any discussion between the grandparents and the parents that the child would return to his parents’ physical custody during this time period.
*997 According to the grandparents, from 2004-2006, mother saw the child two to three times per week at the grandparents’ home plus short visits to her trailer. Once the child started kindergarten at Roberts School, he was living in Syracuse and would see mother at most one night during the week and on the weekends. Once mother moved to Liverpool in 2008, she would see the child more often. On May 1, 2012 mother took the child from school, removed grandparents from any access lists and did not return the child to their care.
To the contrary, mother testified that the child was living with her since birth and spending significant amounts of time with grandparents. She admitted that she agreed to have the child go to Roberts School in Syracuse while she was living in Barneveld because she did not want the child to go to the area schools, even though her daughters had been going there. Mother explained that the child was attending a City of Syracuse school even though he did not live in the City, and that neither she nor anyone else was paying tuition for his attendance. According to mother, the child was commuting to Syracuse from Barneveld and she only let him stay at the grandparents’ home in Syracuse one or two nights a week if it was snowing.
Mother admitted that the child spent a lot of time with the grandparents from 2007-2009 when she was unavailable due to the demands of caring for her ailing father. Mother never explained why she did not take on full-time physical custody of the child after her father passed away and her mother entered a nursing home in 2009. Rather, mother presented that the schedule was two nights with grandparents, two nights and weekends with mother.
The grandparents’ version of events was amply and consistently corroborated by the various members of the Roberts School personnel who testified. All of their records revealed that the child lived in Syracuse, NY with the grandparents since he entered kindergarten. Each of them interacted with the grandparents when parenting issues arose. Some of them never met mother, while others had only seen her once or twice, and none could confirm that she had registered for or attended a parent-teacher conference for the entire time he had been attending Roberts School.
The grandparents’ neighbor, Christine F.—a witness with no interest in the outcome of these proceedings—testified that when she moved into the neighborhood in 2010, the child came *998 over and said “Hi, I’m your neighbor, welcome to the neighborhood.” Thereafter, she would see him three or four times per week and he would frequently go over to her house. It was Ms. F.’s understanding that the child saw his mother on Wednesdays and she met mother on Christmas Eve 2010. In addition, she saw mother in the neighborhood with the child and her daughters trick-or-treating on Halloween in 2010 or 2011.
The court has had the unique opportunity to observe the witnesses and assess their credibility and finds that most of the mother’s witnesses appeared to be coached and rehearsed and seemed to have a list of topics they wanted to address, even if their response was unrelated to the question asked. These witnesses confirmed her various locations of residence from 2002 to 2012. Her friend, Preston C., testified that the child was living with mother in Utica from 2002-2004 and that he saw the grandparents a few times per week dropping off and picking up the child from that residence during that time. He also confirmed that from 2006 to 2009 the child went to Roberts School and that mother left him with the grandparents because of the demands on her time to care for her father and due to inclement weather. Finally, he confirmed that the child was with mother later in the day on three different Christmas Days.
Mother’s daughter S. testified that she recalled going to the grandparents home frequently between 2002 and 2006, and when mother lived in Barneveld, S. saw the grandparents three to four times per week at their house. When mother and the girls moved to Liverpool, the number of nights they visited the grandparents increased and she saw the child once or twice a week and on weekends. According to S., she accompanied mother to two concerts (one in 2011 and one in 2012) and a spring spaghetti dinner, otherwise, they had not attended any events at Roberts School.
Mother’s aunt Christine confirmed that the child spent most of his first two years of life with the grandparents. Mother told aunt Christine that the grandparents agreed to allow the child to stay at their house to go to school. According to aunt Christine, mother saw the child on different weekends varying month to month, and when mother’s parents got sick, the grandparents had the child more.
Mother’s sister, Heather, acknowledged that mother was spending limited amounts of time with the child and it was when mother met Jim that she indicated to Heather that she wanted to spend more time with him. It was Heather’s impres *999 sion that, after 2009 and prior to May 1, 2012, the child had been with the grandparents 60% of the time and with mother 40%.
Mother failed to provide any independent witnesses to validate her version that the child was living with her—no daycare employees or records bearing her address or name as the custodian, no medical providers or records bearing her address as the child’s residence or that she appeared at the office or signed for any treatment or shots, not a single witness from Roberts School who could validate her participation in any academic or extracurricular activity as the identified custodial parent of the child, and no mail addressed to or concerning the child bearing any one of her addresses. Searching the record as a whole, the court must conclude that the grandparents’ version of where the child lived since birth is the substantiated and more accurate representation of reality.
It is well settled that parents have a superior right to custody of their child over a nonparent. (Matter of Vazquez v Velez, 90 AD3d 1559 [4th Dept 2011]; Matter of Rosso v Gerouw-Rosso, 79 AD3d 1726 [4th Dept 2010].) As the Court of Appeals explained, the “State may not deprive a parent of the custody of a child absent surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances.” (Matter of Bennett v Jeffreys, 40 NY2d 543, 544 [1976].) As the mother correctly argued in her memorandum of law, the court is required to first determine as a threshold issue whether extraordinary circumstances exist before considering the best interests of the child. (Matter of Moore v St. Onge, 307 AD2d 421 [3d Dept 2003].)
Pursuant to section 72 of the Domestic Relations Law, grandparents have standing to seek custody of their grandchild if they can demonstrate the existence of such extraordinary circumstances. The statute further provides that “[a]n extended disruption of custody . . . shall constitute an extraordinary circumstance” separate and apart from complete abandonment of the child by the parent. (Domestic Relations Law § 72 [2] [a].) An extended disruption of custody is defined in the statute as a “a prolonged separation of the respondent parent and the child for at least twenty-four continuous months during which the parent voluntarily relinquished care and control of the child and the child resided in the household of the petitioner grandparent or grandparents.” (Id. § 72 [2] [b].) The burden is on the nonparent to prove that extraordinary circumstances *1000 exist. (Matter of Vincent A.B. v Karen T., 30 AD3d 1100, 1101 [4th Dept 2006].) Here, the grandparents contend that extraordinary circumstances exist because of the mother’s voluntary relinquishment of custody of the child.
In determining whether extraordinary circumstances exist, the court has considered the following factors: “[the existence of any] domestic violence, . . . the length of time the child has lived with the nonparent, the quality of that relationship and the length of time the biological parent allowed such custody to continue without trying to assume the primary parental role.” (Matter of Turner v Maiden, 70 AD3d 1214, 1215 [3d Dept 2010] [internal quotation marks and citation omitted].)
The evidence at the trial demonstrates that the child has been in the care of the grandparents since shortly after his birth, thereby constituting an extended disruption of custody between the mother and her child. (Matter of Traci M.S. v Darlene C., 37 AD3d 1083, 1084 [4th Dept 2007]; see also Matter of Ruiz v Travis, 84 AD3d 1242 [2d Dept 2011]; Matter of Wright v Wright, 81 AD3d 740 [2d Dept 2011]; Matter of Gilchrest v Patterson, 55 AD3d 833 [2d Dept 2008].) In addition, the evidence amply demonstrated that mother voluntarily relinquished care and control of the child both by written instruments and her behavior with respect to him.
The mother argued in her memorandum of law that the voluntary relinquishment of custody requires more than an extended disruption of custody, such as incarceration, alcoholism or drug abuse, insanity, abandonment or death. This ignores the plain language of the statute, however, which, as previously discussed, very specifically defines an extended disruption of custody as a 24-month period of time that the child was in the custody of the grandparents. (Domestic Relations Law § 72 [2] [b].) While the circumstances in other particular cases may provide additional reasons that extraordinary circumstances may exist, they do not create an additional burden on the grandparents beyond what is provided in the statute or numerous other cases. Moreover, the cases cited by the respondent do not create a new rule that additional factors beyond the voluntary relinquishment of custody are necessary, but merely include additional facts in support of the finding of extraordinary circumstances in those particular cases. (See Matter of Gilchrest v Patterson, 55 AD3d 833 [2d Dept 2008]; Matter of Danzy v Jones-Moore, 54 AD3d 858 [2d Dept 2008].) Neither case precludes a finding of extraordinary circumstances in the instant case.
*1001 Here, the court finds that the grandparents have “established the existence of the requisite extraordinary circumstances to warrant inquiry into the best interests of the child with respect to the issue of custody.” (Matter of Garrett D. v Kevin L., 56 AD3d 1183, 1184 [4th Dept 2008].) In addition, the mother’s repeated relinquishment of custody, memorialized by signed letters, constitutes extraordinary circumstances. (Matter of Charles C. v Barbara M., 254 AD2d 778 [4th Dept 1998].)
Once the court has determined that extraordinary circumstances exist, the court then must decide what disposition is in the best interests of the child. (Matter of Guinta v Doxtator, 20 AD3d 47, 54 [4th Dept 2005].) The court must consider numerous factors, including
“the continuity and stability of the existing custodial arrangement, the quality of the child’s home environment and that of the [party] seeking custody, the ability of each [party seeking custody] to provide for the child’s emotional and intellectual development, the financial status and ability of each [party seeking custody] to provide for the child, and the individual needs and expressed desires of the child.” (Matter of Tucker v Martin, 75 AD3d 1087, 1090-1091 [4th Dept 2010].)
Since his birth, grandparents have provided the child with love and discipline, together with a home, separate bedroom, furniture, clothes, toys, books, games, sports equipment and pets. Grandfather quit his job to care for the child when he was an infant, and grandparents enrolled him into daycare when he was 13 months old and paid the costs of same. They attended the daycare and pre-K graduation with him. Grandfather cared for the child daily and helped him learn to walk and potty trained him.
After the first year (when grandparents and parents all went to the doctor with the child), grandparents arranged physicians and dentists and attended appointments with him. They have carried the child on their health insurance.
Grandparents arranged for the child’s baptism, are his godparents and sponsored a party for him to celebrate. They have attended to his continuing religious education requirements including First Communion. The child serves as an altar server at their neighborhood parish.
Grandparents have enrolled, financed, participated in and transported the child to Little League, jiujitsu, soccer, skiing, Camp Iroquois and the Say Yes educational program.
*1002 Grandparents arranged for the child’s schooling and prior to May 1, 2012, assumed all responsibility for homework and overseeing his education. Grandfather transported the child to and from school. Grandparents attended kindergarten graduation for the child, as well as parent-teacher conferences and school events, and received correspondence from the school concerning all aspects of the child’s attendance at Roberts School.
The grandparents also took the child to see his father (even during the period when their relationship with father was strained) or facilitated visitation between them a number of times in their home.
The child’s birthday parties were primarily hosted by the grandparents. They traveled extensively with the child including going to visit family in Westchester, NY, as well as yearly 7- to 10-day trips to both Arizona and Florida with him.
Though she is not related to them by blood or marriage, grandparents acted as a parent would toward mother and treated her like a daughter-in-law. Mother agreed that prior to the most recent petitions by father and grandparents, she and her daughters enjoyed a close family relationship with the grandparents. They invited mother and her daughters to their home frequently for dinner (especially in Barneveld), invited them (and later included Jim C.) to family functions and holidays including Christmas, purchased a car for mother, gave mother money to attend school, and allowed her to use their camp in Old Forge on a number of occasions. Grandparents also purchased a mobile home for mother and paid to put it on a lot across the street from them in Barneveld. Thereafter, they paid to have the mobile home moved to Liverpool and grandmother purchased the lot on which it sits. Grandparents took mother and her daughters on vacation and even rented a condominium (in Florida) for them when the child was with the grandparents in Florida.
Separately from what grandparents generously provided for mother, they brought her daughters with them to visit the Suarez family in Westchester and purchased personal items for them. Mother’s daughter S. lived with grandparents for a part of a summer and they paid for her to go to soccer camp.
Grandmother took mother’s daughter J. to lunch a number of times after J.’s maternal grandmother had a stroke and J. was upset. Mother requested that grandmother speak to J. after she was found, at 17 years of age, in bed with a young *1003 man, and also about her running away. Grandparents talked with J. about her desire to attend college and gave her $500 toward her college expenses.
For her part, mother purchased some clothes and food for the child, and took him to the dentist one time with her daughters. She sometimes picked up or dropped off the child at his daycare. She organized a couple of birthday parties for him and took him once or twice to Enchanted Forest with her daughters, her friend Preston C. and his son. Mother attended a spaghetti dinner and two concerts at Roberts School during the 2011-2012 school year. After she moved to Liverpool, she picked up the child from school on occasion. Prior to 2012, mother attended his baseball games about 50% of the time. (He usually had two games per week.) Mother enrolled the child in Boy Scouts in 2012, and after she removed the child from the grandparents’ care in May 2012, she discontinued all of the child’s extracurricular activities except Boy Scouts and baseball.
Mother contended that she spent Christmas Day with the child, however, her evidence is conflicting in that she testified that her exhibit CC represented Christmas 2011 yet the photograph is date-stamped the same as exhibit AA 12/2-/2010. The court cannot ascertain what the illegible number is on that exhibit.
Mother gave grandparents money for the mortgage on her trailer and allowed grandparents to claim the child on their taxes. The court has no information on whether mother claimed the child support she was receiving from father on her taxes, and if so, how she reconciled that when she didn’t claim the child as a dependent. What is clear from the record is that mother did not turn over any of the child support money she received to the grandparents, did not use it to pay for any identified expenses incurred for the child’s health, welfare or maintenance, even while she claimed that she could not afford before or after-school care for him. Nor did she ever reveal to father that she was not exercising sole or even primary physical custody of the child at the time the child support order was entered in 2006 through 2011 or 2012. Moreover, upon receiving the summons for the Oneida County modification of custody/visitation petition, mother specifically told grandmother that she was afraid she would lose child support if father knew that the child was living with the grandparents.
Mother accompanied grandmother to Boston on one occasion to enable the child to visit with father. Otherwise, the record is *1004 devoid of testimony that mother facilitated any other visitation in Massachusetts. Rather, the record reveals several occasions when she delayed, interfered with or ultimately cancelled anticipated parenting time between the child and his father.
Finally, mother claimed that she had provided insurance coverage for the child. However, her exhibit I shows that coverage for the child was only for a period from August 21, 2002 through December 31, 2002, and exhibit J does not list him as an insured or reference any coverage provided to him for any service he received. The explanation of benefits received as exhibit FF was for a service in 2007 only which was presumably charged to mother’s then existing insurance policy.
Mother’s credibility has been questionable throughout all of the petitions and proceedings in 2011 and 2012. While the court declines to find her wholly incredible, it is of the opinion that, while she may not be completely untruthful, she has exhibited several instances of maneuvering, less than truthfulness and perhaps even deceitfulness. Mother received and kept child support money during periods when even she admitted that grandparents were primarily caring for the child. Mother misrepresented to grandparents that the father was not paying her child support for the child. She enrolled the child in Cicero-North Syracuse at a time when she was living in Liverpool—a totally separate school district. She facilitated mother’s daughter S. continuing to attend school in Liverpool after she had moved out of the district by failing to inform the school that she no longer resided at the Liverpool address.
Of most concern to the court are mother’s statements and actions with respect to the continued enrollment of the child in Roberts School in the fall of 2012. Unquestionably, from the filing of father’s first custody/visitation modification petition in 2011, mother was aware of father’s stated concern that the child not be removed from the school he had attended since kindergarten—Roberts School. Mother agreed on the record to continue him in Roberts through the end of the school year in June 2012. The record reveals that she honored that agreement. It is important to note that the father’s petitions were pending and custody and school attendance were outstanding, unresolved and disputed issues at the time that the grandparents filed the instant petition.
After the filing of the grandparents’ petition, and specifically on the record on August 28, 2012, the court confirmed that the child had always and had only gone to Roberts School and is *1005 sued an order that the child was not to be removed from the Syracuse City School District at Roberts without further order of the court. According to the record herein, father called Roberts School after the court appearance to confirm that the child was enrolled to attend fifth grade. Thereafter, father confirmed with mother that the child was registered at Roberts and he should attend there.
On the night before school started in September 2012, the child was injured and taken to urgent care by mother. He specifically requested that his grandparents be called and asked to come to urgent care. When the grandparents arrived, they were informed that his eyeglasses had been broken in the incident. Grandfather advised the child in mother’s presence not to worry and that he (grandfather) would bring the extra pair of glasses from the grandparents’ house to him at Roberts School in the morning. At no time did mother reveal that the child would not be going to Roberts the following morning, that she had continued his enrollment in Cicero-North Syracuse or that she was still trying to straighten out the issue of his school enrollment. At the minimum, this would have been expected if the court is to give credence to mother’s argument that she had already changed the child’s enrollment before the August 28, 2012 court appearance and didn’t know what to do when her attorney could not be personally present with her and had to appear by phone due to a family medical emergency.
Moreover, mother never advised Roberts School that the child would not be attending in September, even after father specifically informed her on August 28th that he had confirmed the child’s continued enrollment at that school. Rather, when he did not appear for school on the first day, and was otherwise unaccounted for, his teacher, the social worker, nurse and principal all became concerned as they sought to ascertain his whereabouts. When first contacted by school personnel, even then, mother did not reveal the true whereabouts of the child. Finally, upon questioning by the school principal, Janet K., mother admitted that she had registered the child at another school.
Mother’s sister, Heather M. confirmed that mother advised her that she had been informed by father that he had enrolled the child in Roberts School in August 2012. Moreover, mother told her sister that she knew she was violating the court order and she was in a panic about what she was going to do.
Again, the court is concerned with mother’s lack of truthfulness and acts of deceit, but it is more concerned that mother’s *1006 behavior with respect to the school issues wholly demonstrates that she has an agenda that is not to be interrupted even by court orders, and that she puts her own needs above those of the child without regard for his sense of stability, comfort or well-being. (See Matter of Valenti v Valenti, 57 AD3d 1131, 1134 [3d Dept 2008].) She disrespected but did not cause harm to the court by failing to abide by the order. She did, however, cause chaos, confusion, stress and distress for her son—all of which could have been undeniably avoided because the child was registered at Roberts by his father after the August 28th court appearance after she had enrolled the child in Cicero-North Syracuse (at a time when he wasn’t even living at that district).
In addition to the foregoing findings, in determining what is in the best interests of this 10-year-old child, the court has considered the parents’ inappropriate decision to bring their four-day-old son to the New York State Fair with the intention of attending a music concert (presumably with thousands of others), and mother allowing the child at his tender age to view “R” rated movies and play “Mature” rated video games. The court is also mindful that father has never had any significant periods of physical custody of the child and has not participated in his education or medical treatment. While the mother advised the father that she had physical custody of the child, in reality she relinquished her parental control and decisionmaking authority in writing and in practice to the grandparents. While mother may have legitimately relied on grandparents to assume primary care of the child while she was caring for her ailing parents, mother provided no explanation for why she did not assume full custody and decisionmaking authority after her father passed away and her mother entered a nursing home. There is simply no reasonable explanation for the fact that the child was attending school in Syracuse while mother’s daughters were attending school in or near Barneveld where mother lived, other than in reality he was primarily residing with the grandparents.
With respect to protecting parental relationships, mother has done very little since 2004 to encourage or facilitate the child’s relationship with his father, and on occasion has hindered contact between them despite her acknowledgment that father regularly paid child support and sought parenting time on various occasions. There is no proof on the record that the father interfered with or hindered the mother’s relation *1007 ship with the child. Moreover, the record is replete with testimony that grandparents facilitated and hosted parenting time between father and child, even during the several year period when they were estranged from father. Of equal significance is the evidence of numerous times that grandparents hosted mother at their home for dinner and holidays, including overnights, with the child, brought mother on vacation with them and the child, and regularly prepared a calendar for mother outlining his school and extracurricular activities and events. Mother has demonstrated that she would not likely be so accommodating to the grandparents. After an appearance on the father’s petition in May 2012, mother went to Roberts School and for the first time since his enrollment there produced the 2006 Oneida County custody order and removed the grandparents from all access to the child and his educational records and information. In addition, she denied all further contact between the grandparents and the child until the court issued a temporary order directing specific visitation periods. Mother declared to the grandparents “you had him all these years, I want my time.” It seems to the court that this statement is an admission that the grandparents had been providing much more to the child than extensive babysitting.
The record reveals that mother first started requesting more time with the child after she met and began a relationship with Jim C. It wasn’t until after she was dating Jim that mother enrolled the child in Boy Scouts although she had been saying for a number of years that she’d like him to try it. Jim attends Boy Scout meetings and functions with the child. Having had the opportunity to observe and listen to Jim C., the court finds him to be a decent and hardworking person who seems to love mother, wants to build a life and family with her, who has no children of his own and who especially enjoys the male camaraderie he experiences with the subject child. Considering the record as a whole, it is clear to the court that Jim’s entrance into mother’s life was a primary motivating factor in her efforts to increase her time with the child and to seek to terminate his residence with the grandparents. In fact, when questioned, Jim replied that “we,” not mother, decided that the child should be moved out of the Syracuse City School District, and that he should be spending more time with “us.” In addition, though he is not a parent to the child, nor at this point even mother’s husband, Jim inserted himself into discussions and issues concerning the child and on a few occasions *1008 personally confronted grandfather. While he may have his heart committed to the child, Jim has no legal authority to make any decisions or demands concerning him.
Unfortunately, from May until December 2012, while he was primarily residing with mother, the child became more distracted, had nervous ticks, was cracking his neck excessively, was biting his nails regularly, had gained weight and was focusing on food. In addition, his attentiveness in school had decreased.
The record here demonstrates that the grandparents have provided the child with a stable, nurturing and loving home and that he has thrived in their care. (Matter of Barcellos v Warren-Kidd, 57 AD3d 984 [2d Dept 2008].) Weighing all the evidence, the court must conclude that the child’s best interests require that custody be granted to the grandparents.
In addition, the court has considered the stipulation of the father and grandparents to an award of joint legal custody between them in view of the record as a whole. The evidence is clear that mother and grandparents are in an acrimonious relationship and can no longer act in concert to advance the best interests of the child. However, this is not the case as between father and grandparents who have historically risen above their differences to preserve contact and a relationship between father and the child. Here, upon consideration of the record as a whole, the court finds that it would be in the best interests of the child to award joint legal custody of the child to the grandparents and to the father. (Matter of Demeter v Alayon, 90 AD3d 1045 [2d Dept 2011]; Matter of Dwyer-Hayde v Forcier, 67 AD3d 1011 [2d Dept 2009].)
As part of the trial in this matter, the court held a Lincoln hearing with the child at which his attorney was present. The decision whether to hold a Lincoln hearing is within the discretion of the court. (Matter of DeRuzzio v Ruggles, 88 AD3d 1091, 1091-1092 [3d Dept 2011]; Matter of Walker v Tollman, 256 AD2d 1021, 1022 [3d Dept 1998], Iv denied 93 NY2d 804 [1999].) Mother’s counsel questioned the court’s decision to meet with the child prior to the conclusion of mother’s defense case. The Attorney for the Child did not object, nor did counsel for the grandparents or father. Matter of Lincoln v Lincoln (24 NY2d 270 [1969]) does not proscribe any specific time when the Lincoln hearing must or should be held, though case law is clear that it needs to be held during the fact-finding hearing and not before. (Matter of Spencer v Spencer, 85 AD3d 1244 [3d Dept 2011].)
*1009 In the present case, the mother had presented substantial testimony and evidence prior to the Lincoln hearing. As a result, it was clear to the court what the issues in the case were. More importantly, prior to the Lincoln hearing, there were a number of allegations back and forth that various parties had or were attempting to influence the child’s statements and position despite repeated warnings by the court that no one except his attorney was to discuss the court proceedings with him. Upon commencement of the trial and the days following, the court attempted to randomly rotate custodial time among mother, father and grandparents while giving no indication of what its intention or possible pattern might be. In this way, the court attempted to insure that no party would be certain that they had the child “last” before he was seen by the court. It seemed to the court that this was the only reasonable and fair way to insure a minimum degree of influence and coaching and to enable the child to speak freely from his perspective. Proceeding in this fashion gave him only brief notice and preparation time, however, the court is satisfied that no one party unduly influenced his responses to the court’s inquiry. While the court is bound by confidentiality rules not to reveal the child’s statements, the court thanks the parties for sharing with it, however briefly, their bright, energetic, honest and engaging boy. It was a pleasure for the court to have met him. Considering the posturing of the parties, the prior failure to adhere to court orders, and trying the court’s best to minimize the stress and burden on the child, the court believes that it properly held the Lincoln hearing at a time when, in its discretion, it deemed most fit. (Matter of VanDusen v Riggs, 77 AD3d 1355 [4th Dept 2010].)
Finally, at the conclusion of the closing arguments offered by counsel on December 7th, the court began to deliver its decision concerning a temporary order and was interrupted by chambers staff who advised that the person who was at Roberts School to pick up the child could not locate him. Recognizing that this was the same person who had been enlisted by grandparents to deliver the child to the courthouse for the Lincoln hearing, the court inquired of grandparents’ counsel, Attorney Habib, if she was aware of that day’s arrangements for the child. When Attorney Habib informed the court that she was not, the court immediately advised all parties and counsel of the circumstances and mother immediately advised the court that she had arranged for Jim C. to pick up the child from *1010 Roberts School that day. Having resolved the issue, the court proceeded with its decision. Although the court was initially shocked and concerned to receive information that the child’s whereabouts were unknown—particularly given the history of the abrupt removal of him from school in May 2012, the acrimony between mother and the other parties, and recognizing that the trial had come to an end the parties were presumably anticipating some kind of decision from the court—this information had no bearing on the terms of the temporary order of custody which granted mother and father parenting time.
The court has searched the statewide registry of orders of protection, sex offender registry and the Family Court’s child protective records, and having notified said parties of the results of these searches; and the court having considered and relied upon the following results of these searches in making this decision—no results which would impact this order.
Now, therefore, in view of the foregoing findings made upon the record as a whole and after careful and due deliberation; it is ordered, that petitioners, Laura Suarez and Ricardo Suarez, and respondent, Ernesto Suarez, shall be awarded joint legal custody of the minor child; and it is further ordered, that petitioners, Laura Suarez and Ricardo Suarez, shall be awarded primary physical custody of the minor child.
It is further ordered, that respondent, Melissa Williams, shall have parenting time with the minor child, as follows:
1. On Tuesday after school, or at noon if there is no school, until Wednesday at the start of school, or 6:00 p.m. if there is no school;
2. On the third full weekend of every month from Friday after school, or noon if there is no school, until Sunday at 6:00 p.m.;
3. August 1st at noon until August 15th at 9:00 p.m. each and every year commencing in 2013;
4. Every school spring break from noon on the Saturday after school lets out until 6:00 p.m. on Saturday before school resumes, all commencing in 2014. This schedule shall be modified in the event that Easter falls during the spring break. In that event, if Easter is on the first weekend of spring break, then mother’s parenting time shall commence on Sunday at 6:00 p.m. In the event that Easter is on the second weekend of the spring break, mother’s parenting time shall end on Saturday at 6:00 p.m. in odd years and on Friday at 6:00 p.m. in even years;
*1011 5. Every Thanksgiving holiday in even years, commencing in 2014, from Wednesday (the day before Thanksgiving) after school, or noon if there is no school, until Sunday at 6:00 p.m.;
6. Every Martin Luther King holiday from noon until 6:00 p.m. unless it immediately follows mother’s weekend parenting time; in which case it shall be from 12:01 a.m. until 6:00 p.m.
It is further ordered, that respondent, Ernesto Suarez, shall have parenting time with the minor child, as follows:
1. On the second full weekend of every month from Friday after school, or noon if there is no school, until Sunday at 6:00 p.m.;
2. July 1st at noon to July 30th at 9:00 p.m. each and every year commencing in 2013;
3. Every school winter break from noon on the Saturday after school lets out until 6:00 p.m. on the Saturday before school resumes, commencing in 2014;
4. Every other Easter holiday, in even years, commencing in 2014, from Friday after school, or Thursday after school if there is no school on Friday, until Sunday at 6:00 p.m. In the event that spring break precedes the Easter holiday, father’s parenting time shall commence at 6:00 p.m. on Friday;
5. Every Columbus Day holiday from noon until 6:00 p.m., unless it immediately follows father’s weekend parenting time, in which case it shall be from 12:01 a.m. until 6:00 p.m.
It is further ordered, that petitioners, Laura Suarez and Ricardo Suarez, and respondents, Ernesto Suarez and Melissa Williams, shall share parenting time with the minor child, on the below listed holidays:
1. Christmas Eve at noon until New Year’s Day at 3:00 p.m. as follows:
2013— Laura and Ricardo Suarez
2014— Melissa Williams
2015— Ernesto Suarez
2016— Laura and Ricardo Suarez
2017— Melissa Williams
2018— Ernesto Suarez
2019— Laura and Ricardo Suarez;
2. Memorial Day at noon until 6:00 p.m., unless it immediately follows scheduled weekend parenting time with the party who is to enjoy time on Memorial Day, in which case it shall commence at 12:01 a.m., as follows:
*1012 2013— Melissa Williams
2014— Ernesto Suarez
2015— Laura and Ricardo Suarez
2016— Melissa Williams
2017— Ernesto Suarez
2018— Laura and Ricardo Suarez
2019— Melissa Williams
2020— Ernesto Suarez.
It is further ordered, that petitioners, Laura Suarez and Ricardo Suarez, shall have parenting time with the minor child, at all other times not specifically recited herein; and it is further ordered, that each party shall make all reasonable efforts to insure that the minor child attends Catholic Mass on Saturday or Sunday and any other religious education requirements while he is in their care; and it is further ordered, that no party shall demean or make derogatory remarks about any other party to or in the presence of the minor child; and it is further ordered, that there shall be such additional and further parenting time with the minor child, as may be agreed upon by all parties; and it is further ordered, that the corrected temporary order of custody/visitation dated December 7, 2012 is hereby vacated.